## CONTINENTAL TIE & LUMBER CO. *v.* UNITED STATES.

No. 560. Argued April 14, 1932.—Decided May 16, 1932.

Mr. *George E. H. Goodner,* with whom *Messrs. John G. Buchanan* and *Paul G. Rodewald* were on the brief, for petitioner.

*Assistant Attorney General Rugg,* with whom *Solicitor General Thacher,* and *Messrs. Joseph H. Sheppard, Bradley B. Gilman,* and *Erwin N. Griswold* were on the brief, for the United States.

292

MR. JUSTICE ROBERTS delivered the opinion of the Court.

For the year 1920 the petitioner filed a consolidated income tax return for itself and the Cimarron and Northwestern Railway Company and paid the tax shown as due. Subsequently a claim for refund was prosecuted, whereupon the Commissioner made a reaudit and added to the railway's income some $27,000. The refund granted was diminished by the amount of the additional tax resulting from the increase in income so determined. The petitioner objected to this reduction and brought suit

in the Court of Claims to recover the full amount claimed to be refundable. The railway company is a short-line carrier whose road was in possession and control of the United States and operated by the Director General of Railroads from December 28, 1917, to June 3, 1918, when it was relinquished, and thereafter throughout the remainder of the period of federal control operated by its owner. Approximately $25,000 of the additional income determined by the Commissioner consisted of a payment to the railway pursuant to an award of the Interstate Commerce Commission under the terms of § 204 of the Transportation Act, 1920.[1] This section provided for such an award and payment to a railroad which during any part of the period of federal control competed for traffic, or connected, with one under federal control, and sustained a deficit in operating income for that portion of the period during which it operated its own railroad. The act directed the Commission to compare the results of such operation with those of the test period, defined as the three years ending June 30, 1917; and if less favorable during the period of federal control than during the test period, to award an amount calculated as prescribed by the section. The Commission made an award and the Secretary of the Treasury paid the railway.

The petitioner asserted (1) that the sum received was not income within the intent of the Sixteenth Amendment or § 213 of the Revenue Act of 1918; (2) that if income, it was not taxable for 1920, as held by the Commissioner, but for 1923, the year in which the amount was determined and paid. The Court of Claims denied recovery.

What we have said in *Texas & Pacific Ry. Co.* v. *United States*, decided this day, *ante*, p. 285, is determinative of the first contention. Section 209 of the Transportation Act guaranteed the payment of any deficiency below a

---

[1] Ch. 91, 41 Stat. 456, 460.

fixed minimum of operating income for the six months ensuing the termination of federal control to railroads which had been taken over by the United States. By the terms of § 204 payment was to be made to railroads not under federal control of a proportion of any operating deficit suffered in the period of such control. The underlying purpose of Congress was the same in both cases. Railroads falling within § 204 were principally short lines. They were known to have suffered serious losses in income due to routing arrangements and other administrative measures made necessary by Government operation of the larger railroad systems. The Transportation Act did not contemplate that the payments to be made pursuant to § 204 were in any sense just compensation for the taking of property. There was no room for such reimbursement, as the short lines were during the time to which the section applied in the possession and management of their owners. Congress, nevertheless, realized that federal operation had caused them consequential losses, at least partial redress for which was the purpose of the section where actual deficits in income had resulted. For the reasons set forth in *Texas & Pacific Ry. Co.* v. *United States, supra,* we hold that these payments were not subsidies or bonuses, but were income within the intent of the Amendment and the statute.

The petitioner kept its accounts upon the accrual basis. The Government insists, and the Court of Claims held, that the right to payment having ripened in 1920 the taxpayer should have returned the estimated award under § 204 as income for that year. The petitioner replies that a determination whether it would receive any award under the section and, if so, the amount of it depended on so many contingencies that no reasonable estimate could have been made in 1920, and that the sum ultimately ascertained should be deemed income for 1923, the year of the award and payment.

The Transportation Act took effect on February 28, 1920. On June 10 the Interstate Commerce Commission issued general instructions governing the compilation and submission of data by carriers entitled to awards under § 204. The petitioner correctly states that at the date of the Act's adoption no railroad had a vested right in any amount; until the Commission made an award nothing could be paid, no proceeding was available to compel an allowance, or to determine the elements which should enter into the calculation. In short, says the petitioner, the carrier had no rights, but was dependent solely upon the Commission's exercise of an unrestrained discretion, and until an award was made nothing accrued. But we think that the function of the Commission under the act was ministerial, to ascertain the facts with respect to the carrier's operating income by a comparison of the experience during the test period with that during the term of federal control. The right to the award was fixed by the passage of the Transportation Act. What remained was mere administrative procedure to ascertain the amount to be paid. Petitioner's right to payment ripened when the act became law. What sum of money that right represented is, of course, a different matter.

The petitioner says that at the date of the passage of the act it was impossible to predict that any award would be made to the railway, and, assuming one would eventuate, its amount could not be estimated, for the reason that the principles upon which awards were to be made had to be settled by the Commission and were not finally formulated until 1923. The Government insists that while adjustments or settlement of principles by the Commission might vary the amount to be awarded, the petitioner's case presented problems not differing from those confronting many business concerns which keep accounts on an accrual basis and have to estimate for the tax year the amount to be received on transactions undoubtedly

allocable to such year. Admitting there might be differences and discrepancies between the railway's estimate and the amount awarded by the Commission, these, says the Government, could, as in similar cases, have been adjusted by an additional assessment or a claim for refund after final determination of the amount due.

The case does not fall within the principle that where the liability is undetermined in the tax year the taxpayer is not called upon to accrue any sum (*Lucas* v. *American Code Co.*, 280 U. S. 445), but presents the problem whether the taxpayer had in its own books and accounts data to which it could apply the calculations required by the statute and ascertain the *quantum* of the award within reasonable limits.

The carriers kept their accounts according to standards prescribed by the Commission; and these necessarily were the source of information requisite for ascertainment of the results of operation in the two periods to be compared. In the calculation for two such brief periods allowance had to be made for the fact that certain operating charges entered in the books would not accurately reflect true income. Such, for instance, were maintenance charges and those to reserve accounts. The enormous increase in labor and material costs after the expiration of the test period had also to be considered in comparing charges for costs of repairs and renewals in the two periods. Section 204 incorporated by reference the terms of § 209 applicable to the method of treating such items, and the latter in turn referred to the relevant provisions of § 5 (a) of the standard operating contract between the Director General and the various railroads. As might have been expected, the general principles thus formulated did not cover in detail questions of fact, the solution of which required in some degree the exercise of opinion and judgment. Thus difference might fairly arise as to when re-

serve accounts ought to be closed out, as to how much of the sum actually expended for maintenance within a given time was properly allocable to that period, and how much to later years; at what price renewals and replacements should be charged in view of the rapidly mounting cost of material; what factor of difference should be allowed for the efficiency of labor in the pre-war and post-war periods. The petitioner points to the fact that these questions were raised by the railroads under § 209, that the Commission gave extended consideration to them, and that, as respects sundry of them, the applicable principles were not settled until 1921, 1922 and 1923. Petitioner might have added that the Commission, while attempting as far as possible to formulate general principles applicable to large groups of carriers, found it necessary in addition to consider the peculiar conditions and special circumstances affecting individual carriers in order in each case to do justice to the carrier and to the United States.[2] But in spite of these inherent difficulties we think it was possible for a carrier to ascertain with reasonable accuracy the amount of the award to be paid by the Government. Subsequent to its order of June 10, 1920, the Commission made no amendment or alteration of the rules with respect to the information to be furnished under § 204. Obviously the data had to be obtained from the railway's books and accounts and from entries therein all made prior to March 1, 1920. These accounts contained all the information that could ever be available touching relevant expenditures. Compare *United States* v. *Anderson,* 269 U. S. 422. The petitioner was promptly informed by the terms of § 209, as supplemented by the instructions issued by the Commission, of the method to be followed in allocating charges to operation during periods under in-

[2] Maintenance Expenses under Section 209, 70 I. C. C. 115.

quiry. It does not appear that a proper effort would not have obtained a result approximately in accord with what the Commission ultimately found.

Much is made by the petitioner of the fact that as a result of representations by the carriers the Commission from time to time during 1921, 1922 and 1923 promulgated rulings respecting the method of adjusting book charges to actual experience, and it is asserted that petitioner could not in 1920 have known what these rulings were to be. But it is not clear that if the taxpayer had acted promptly an award could not have been made during 1920, or at least the principles upon which the Commission would adjust the railway's accounts to reflect true income have been settled during that year sufficiently to enable the railway to ascertain with reasonable accuracy the amount of the probable award. The reports of the Interstate Commerce Commission show that it was possible for a carrier whose claim arose under § 209 to obtain a final award early in 1921, prior to the time for preparing its income tax return.[3] From the record it would seem that in spite of the fact that its return was not made until November, 1922, the petitioner made up its claim by taking maintenance charges as appearing in its books without attempt at allocation as between the limited periods in which they were entered and the probable useful life of the installations. Petitioner must have known that the entire amounts charged to maintenance during the respective periods would not be properly allowable in ascertaining true income for each period. The books and accounts fixed the maximum amount of any probable award, and if petitioner had endeavored to make reasonable adjustments of book figures it could have arrived at a figure to be accrued for the year 1920. Any necessary adjustment of its tax could

---

[3] Norfolk Southern R. Co., 65 I. C. C. 798.

readily have been accomplished by an amended return, claim for refund, or additional assessment, as the final award of the Commission might warrant.

For these reasons the Court of Claims correctly held that the amount awarded was taxable income for the year 1920.

*Judgment affirmed.*